IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE BASKETBALL MARKETING | : | CIVIL ACTION |
| COMPANY, INC. d/b/a AND 1, | : | |
| BMC PLAYERS, INC. | : | |
| | : | |
| v. | : | NO.  04-1733 |
| | : | |
| FX DIGITAL MEDIA, INC., | : | |
| COLUMBUS WOODRUFF, and | : | |
| TIM GITTENS a/k/a HEADACHE | : | |

_____ **MEMORANDUM AND ORDER**

**Juan R. Sánchez, J.**                                                          **March 10, 2006**

Basketball Marketing Company Inc., known as And 1, asks this Court to find the promoters of a rival street ball tour and Tim Gittens, a player known as Headache, infringed the company's trademarks.  Default has been entered against defendants FX Digital Media Inc. (FX) and Columbus Woodruff.  Because I find Gittens's contract with And 1 required him to wear And 1 branded items and allowed him to play for other tours, I will grant judgment in favor of Gittens.

**FINDINGS OF FACT**[1]

And 1 manufactures, sells and distributes street basketball related merchandise, including footwear, apparel and accessories, bearing the And 1 name, logos and trademarks.  (Trial Tr. 131, Sept. 14, 2005.)  Since 2000, And 1 has organized, sponsored and promoted the Mix Tape Tour, a series of street basketball games featuring professional street basketball players.  (Tr. 126-27.)  In 2003, the And 1 Mix Tape Tour played to  more than 150,000 people in thirty American cities.  (Tr.

_____

[1]I held a bench trial on September 14, 2005 during which Gittens, Woodruff and And 1's corporate designee testified.  I specifically find credible Gittens's testimony, whose demeanor on the stand was far from a headache.

127.) And 1 distributes and sells DVDs and videos from its Mix Tape Tour, which is also the basis

of the series on ESPN television, "Streetball, The And 1 Mix Tape Tour." ( Tr. 126-27.)  And 1's

target audience for its Mix Tape Tour is pre-teen to adult basketball players.  (Tr. 131-32.)  And 1

owns seven trademarks including the And 1 logo, the name And 1, and the words "Mix Tape" in

block lettering, although none of these trademarks are classified as for the promotion, sale, arranging

or production of basketball games or tournaments.  (Tr. 125, 128-29.)

Gittens is a professional street basketball player, formerly with the And 1 Mix Tape Tour.

Endorsement Agreements between Gittens and And 1, dated August 1, 2001,[2] February 1, 2002 and

November 22, 2002, required Gittens to "use reasonable efforts to wear and use exclusively And 1

Products throughout the term of this Agreement while participating or attending all athletic activities,

including but not limited to, any occasion during which he wears athletic apparel and/or poses for

photographs."  (Tr. 109-10; Ex. P-19, ¶ 11.)  Gittens was allowed, under the agreements, to

participate in basketball games and related events sponsored by companies other than And 1.  (Ex.

P-19, ¶ 9; Ex. D-2, ¶ 8.)  Under the agreements, Gittens was obligated to notify And 1 if any third

party asked him to use the And 1 name or logos.  (Tr. 138.)  The February 1, 2002 endorsement

agreement states:

> Under no circumstances may Player [Gittens] allow a third-party, other than And 1,
> to use the And 1 name or logos to promote a basketball game or tournament.  Should
> a third-party contact Player and ask him to use the And 1 name or logos for such a
> use, Player [Gittens] shall immediately notify And 1.

(Ex. P-19, ¶ 10.)  The November 22, 2002 Endorsement Agreement contains the same language and

adds a clause relieving Gittens of responsibility for any third party's use of the And 1 trademarks.

---

[2]The August 1, 2001 agreement was testified to, but was not offered as evidence.

2

(Ex.D-2, ¶ 9.)

Woodruff, through his company, FX, sponsored the eight Streetball Legends basketball games from November, 2000 through December, 2002 which are at issue.  (Tr. 22.)  These games were similar to the games on the And 1 Mix Tape Tour and held in cities the Mix Tape Tour did not visit.  (Tr. 89.)  And 1 never gave Woodruff or FX permission to use its name and/or marks for these games.  (Tr. 65.)  The target audience for FX's Streetball Legends games was high school to adult players and fans.  (Tr. 104.)  Gittens played in six of the eight Streetball Legends games.  (Tr. 25, 26, 36, 42, 50, 60, 101.)

The first game was in Cleveland, Ohio in November, 2000, organized with the help of Mark Edwards, a sometime marketing consultant to And 1, who Woodruff thought was an employee of And 1 at the time.  (Tr. 21-22.)  Edwards promoted the games and arranged for and paid the players for the first few games organized by Woodruff and FX.  The second game took place in Toledo, Ohio and was marketed as "featuring players from the And 1 Mix Tape" on flyers and radio advertisements marketing the game.  (Tr. 26.)  This game was attended by Chris Hightower, an And 1 employee, who told Woodruff he could not call his games "And 1 Games," but otherwise complimented Woodruff on the event.  (Tr. 86-87.)   After the third game, which took place in Detroit in January of 2001, FX and Woodruff stopped working with Mark Edwards.  For the remaining five games, Gittens arranged for and paid basketball players for the Streetball Legends games.  (Tr. 42-43.)

Woodruff testified he asked Gittens to provide the players "because he was different from the rest of the guys, . . . he didn't go out and party, he didn't go out and drink[.] . . . He was more of a homebody, so he kind of gravitate to myself and my wife, who didn't do those things either."  (Tr.

91.)  Woodruff said the players looked at Headache (Gittens) as a leader.  (Tr. 91.)  Gittens procured

street ball players such as Half Man/Half Amazing, Main Event, Shane the Dribbling Machine, High

Octane, Stick With It and Hot Sauce for the Legends tour, shepherded them onto planes, to hotel

rooms and paid them for playing with gate receipts provided by Woodruff.  (Tr. 42, 91, 93, 99.)

FX and Woodruff marketed the Streetball Legends games with flyers and radio

advertisements.  All of these flyers stated Streetball Legends "featured players from the And 1 Mix

Tapes." (Tr. 26; Exs. P-10, P-14, P-15.)  The reverse side of the flyers used to advertise the Detroit

game in January 2001 states: "You have seen the And 1 mixtapes, bangin [sic] commercials and

videos now come see them live in person.  The Hottest Street Basketball Team Ever!!!"  (Ex. P-18.)

The reverse side of the flyers used to advertise the Indianapolis and Bahamas events state: "You have

seen the mixtapes, banging commercials and videos and now come see them live in person.  The

Hottest Street Basketball Team Ever!!!"  (Exs. P-14, P-15.)

Gittens provided FX with an image of himself for T-shirts sold at the Cincinnati game and

used on flyers used to advertise the games.  (Tr. 42.)  All of the players handed out the flyers on the

day of the games they played in.  (Tr. 93, 116.)  Gittens handed out flyers advertising the games in

Cincinnati, Cleveland, Indianapolis and the Bahamas.  (Tr. 93.)  Gittens did not assist Woodruff and

FX in designing or printing the flyers, applying for permits,  hiring any of the facilities or selling

tickets for any of the Streetball Legends games.  Gittens did not show any of the FX flyers

advertising the Streetball Legends games to And 1, or  notify And 1 of any of FX's use of the And 1

trademarks and logos in promoting the Streetball Legends games.  (Tr. 139.)

While under contract with And 1, Gittens designed an autograph card featuring a picture of

himself wearing official And 1 apparel.  Gittens printed 15,000 to 20,000 of the cards to provide

4

autographs to children, to promote himself, his company, his website and his basketball camp.  (Tr. 144, 121-22.)  And 1 knew of Gittens's use of the autograph cards.  (Tr. 118.)  Gittens handed out these autograph cards both at Streetball Legends events and official And 1 events.  (Tr. 113.)

## DISCUSSION

And 1 claims Woodruff and FX engaged in trademark infringement and false advertising under the Lanham Act[3] and makes a claim of contributory infringement against Gittens.  And 1 also claims unfair competition and unfair trade practices, intentional interference with existing and prospective contractual relations, and unjust enrichment against defendants Woodruff, FX and Gittens, and breach of contract against Gittens.  Default has been entered against Woodruff and FX for failing to respond, leaving only the issue as to FX and Woodruff the amount of damages,

---

[3]Section 1125 of the Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misdealing representation of fact which- (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising, or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Section 1114 of the Lanham Act provides:

> Any person who shall, without the consent of the registrant...use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of ant goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant[.]

15 U.S.C. § 1114(1)(a).

attorney's fees and costs, pursuant to 15 U.S.C. § 1117.  The Court must only decide And 1's claims against Gittens.

        To prove a Lanham Act violation, And 1 must demonstrate "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

        If a plaintiff can show "the mark at issue is federally registered and has become incontestable, then validity, legal protectability, and ownership are proved." *Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) (citing *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991).  To be incontestable under 15 U.S.C. § 1065, a mark must be registered with the U.S. Patent and Trademark Office (PTO) and in continuous use for five years subsequent to registration without challenge.  *Id.* at 438 n.4 (citing 15 U.S.C. §§ 1058, 1065; *Fisons Horticulture, Inc. v. Vigoro Indus.*, F.3d 466, 472 n.7 (3d Cir. 1994)).

        If not incontestable, a mark's "validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive." *Id.* at 438.  A mark is inherently distinctive if it may be "fairly characterized as arbitrary, fanciful or suggestive." *Id.* at 438 n.5.  A mark has secondary meaning when it is "interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." *Id.*  The Third Circuit follows the degree of imagination test which divides marks into four classifications – generic, descriptive, suggestive, and arbitrary or fanciful – to determine whether a mark is protectable as a trademark.  *A & H Sportswear,* 237 F.3d at 221.  Arbitrary or fanciful marks are those using terms that do not describe or suggest anything about the product, and

"bear no logical or suggestive relation to the actual characteristics of the goods." *Id.* (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986)). Suggestive marks require consumers to use "imagination, thought or perception" to determine what the product is. *Honickman*, 808 F.2d at 296.

Plaintiffs have seven trademarks registered with the PTO for the phrase And 1, their logo which features the phrase And 1 and a figure playing basketball, and the phrase "Mix Tape." Only one of these trademarks, the phrase And 1, had been registered for the requisite five years at the times of infringement to be incontestable under the statute. As to the other marks, And 1 had to show either the marks are inherently distinctive, or they have acquired a secondary meaning.

Registration gives trademarks a presumption of validity and distinction. 15 U.S.C. § 1115(a); *Ciba-Geigy Corp. v. Bolar Pharm. Co. Inc.*, 747 F.2d 844, 852 (3d Cir. 1984). A plaintiff is entitled to "a strong prima facie presumption that its registered mark is either not 'merely descriptive' or if descriptive, that secondary meaning is presumed, which amounts to the same thing." 2 McCarthy on Trademarks and Unfair Competition, 4th ed. § 11:43, *cited in A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 167 F. Supp. 2d 770, 776 (E.D. Pa. 2001); *see also FM 103.1, Inc. v. Universal Broad. of N. Y., Inc.*, 929 F. Supp. 187, 194 (D.N.J. 1996) (reasoning registration of a service mark creates a presumption the mark is not generic).

And 1 does not need to rely only on the presumption from registration because "Mix Tape" has acquired a secondary meaning. A secondary meaning is acquired when in the minds of the public the primary significance of a mark is to identify its source. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995). The Mix Tape Tour, Mix Tape videos and DVDs, and television show on ESPN identify the phrase "Mix Tape" with And 1. The use of the phrase "mix

tape" by FX and Woodruff in the flyers advertising their Streetball Legends games, caused the public to identify the Streetball Legends games with the And 1 Mix Tape Tour.  Gittens has not rebutted the presumption of secondary meaning.

Once validity, legal protectability and ownership of a mark have been established, the crux of an infringement claim lies in the third prong: the defendant's use of the mark to identify goods or services causes a "likelihood of confusion." *A & H Sportswear*, 237 F.3d at 210.  And 1 must show that the defendants created a likelihood of confusion between And 1's clothing and video products and FX's live Streetball Legends games.  Because defendants Woodruff and FX defaulted, the only issue is whether defendant Gittens's use of And 1's marks created a likelihood of confusion.

A likelihood of confusion exists when "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *A & H Sportswear,* 237 F.3d at 211.  The Third Circuit has identified ten factors to determine whether there is a likelihood of confusion between marks used on either competing or non-competing goods:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion
> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertiser through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers because of the similarity of function;
> (10) other facts suggesting that the consuming public might expect the prior owner

to manufacture a product in the defendant's market or that he is likely to expand into that market.

*A&H,* 237 F.3d at 215 (citing *Interpace Corp. v. Lapp Inc.*, 721 F.2d 460, 463 (3d Cir. 1983), and applying the *Lapp* factors to competing as well as non-competing goods).   No factor is determinative; each is weighed separately and balanced against the others.  *Checkpoint Sys. v. Check Point Software Techs. Inc.*, 269 F.3d 270, 280 (3d Cir. 2001).

When I weigh the *Lapp* factors, I find Gittens's use of the marks did not create a likelihood of confusion because Gittens was entitled to use the And 1 logo on his autograph card, on his uniform and on a basketball he is holding in the photograph.[4]  Only the first, fourth, eighth and ninth factors apply to Gittens.  Under the first *Lapp* factor the similarity of the marks does not determine the likelihood of confusion, as the use of the And 1 marks was not a misuse by Gittens.  The marks used on the Streetball Legends promotional flyers, the phrases "mix tape" and And 1, and the And 1 logo, are identical to And 1's marks.  Gittens did not design or create the flyers; thus, the first factor does not weigh heavily in favor of a finding of a likelihood of confusion arising from Gittens's use of And 1's marks.

The fourth *Lapp* factor asks how long the defendant used the mark.  Defendants FX and Woodruff used the And 1 marks for two years during which Gittens distributed promotional flyers for the Streetball Legends games on, at the most, four occasions.  Gittens used his autograph card for about a year without any evidence of actual confusion at both official And 1 and Streetball Legends games to promote himself, not the Streetball Legends games.

─────────────

[4]And 1 alleges Gittens used their marks by procuring players for games promoted by FX, Woodruff and/or Mark Edwards, handing out promotional flyers for the games and by using his autograph cards.  And 1 has introduced no evidence that Gittens used And 1's marks in any way in arranging for players to play in the Streetball Legends games.

9

Because the parties targeted the same consumers, the eighth factor, market overlap, creates "a stronger likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 289. Gittens targeted a smaller group of these same consumers with his autograph cards, but his use was permissive, not a misuse.

The ninth *Lapp* factor is the relationship of the goods bearing the marks. Gittens argues And 1's marks are registered only for their clothing and athletic products which are not related in the minds of consumers to the Streetball Legends live basketball games. Even though the trademarks are not classified as for live basketball events, the popularity of the And 1 Mix Tape Tour games increases the likelihood of confusion of the two street ball tours. The likelihood of confusion did not arise from defendant Gittens's use of And 1's marks but from the marketing of the Streetball Legends tour.

Balancing the *Lapp* factors, I conclude Gittens's use of And 1's marks did not lead to a likelihood of confusion on the part of consumers because he did not create or promote the use of the marks in the flyers.[5] Gittens's use of the And 1 marks on his autograph cards was required by his contract and so could not infringe. By default, FX and Woodruff infringed And 1's marks.

And 1 argues Gittens is jointly and severally liable for FX and Woodruff's infringement. Principles of joint and several liability apply to claims brought under the Lanham Act. *Interstate Battery Sys. of Am. Inc. v. Wright*, 811 F. Supp. 237, 244 n.5 (N.D. Tex. 1993) (citing *SmithKline Beckman Corp. v. Pennex Prods. Co.*, 103 F.R.D. 539, 540 (E.D. Pa. 1984)). Defendants are jointly responsible where they "act together in committing the wrong" or where their separate acts "unite in causing a single injury." *Allen Organ Co. v. Galanti Organ Builders Inc.*, 798 F. Supp. 1162,

---

[5] Because I have determined Gittens's use of the And 1 marks did not create a likelihood of confusion in the minds of consumers, it is not necessary to consider Gittens's fair use defense.

1171 (E.D. Pa. 1992), *aff'd*, 995 F.2d 215 (3d Cir. 1993).  To impose joint and several liability for contributory infringement, And 1 must prove that Gittens's actions "[r]ise to a level of substantial assistance" to FX and Woodruff.  *Id.*  Substantial assistance is shown if the defendant encouraged the actual infringement, assisted in the preparation of the alleged infringement, or was the sole source of the alleged infringing materials. *Id.* at 1171-72.

Gittens did not plan any of the Streetball Legends basketball games with Woodruff or FX. Nor did he do anything more to promote the games than any other player.  While Gittens did provide a photograph of himself to Woodruff and FX which was used on some of the flyers promoting the games, he did not design the flyers.  The And 1 logo is partially visible in the photograph provided by Gittens, however, under the terms of his contract with And 1, Gittens was encouraged by And 1 to be seen wearing And 1 basketball gear, even when not appearing in And 1 events.

Gittens did help Woodruff by making arrangements with the players for five of the Streetball Legends games.  This does not, however, rise to the "level of substantial assistance" on the part of Gittens. And 1 has not shown that Gittens was the sole source, or any source at all of the alleged infringing materials.  Joint and several liability is not imposed.

The Lanham Act does not limit liability to the direct infringer.  *Transdermal Products, Inc. v. Performance Contract Packaging, Inc.*, 943 F. Supp. 551, 552-53 (E.D. Pa. 1996) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982)).  And 1 argues even if the facts do not support a direct infringement claim against Gittens, he is contributorily responsible.  To establish contributory infringement, And 1 must show supply of a product and knowledge of direct

11

infringement.[6]  *AT&T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1432 (3d Cir. 1994).

Gittens did not promote or facilitate the infringement of And 1's marks.  And 1 has not provided any

evidence Gittens knew FX and Woodruff were infringing And 1's marks.

　　　To assert a claim for false advertising under the Lanham Act, And 1 must prove defendants'

commercial message is either literally false or tends to deceive consumers.  *Novartis Consumer*

*Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002).

If the plaintiff proves literal falsity there is no need to show that the buying public was misled.

*Johnson & Johnson v. Rhone-Poulenc*, 19 F.3d 125, 129-30 (3d Cir. 1994).  If there is no actual

falsity, the plaintiff must prove "there is actual deception or at least a tendency to deceive a

substantial portion of the intended audience."  *Santana Prods. v. Bobrick Washroom Equip., Inc.*,

401 F.3d 123, 136 (3d Cir. 2005).

　　　And 1 brought no evidence any message presented by Gittens was actually false.  Gittens did

not create or present the flyers used by FX to promote their Streetball Legends games.  His mere

assistance in distributing the flyers does not amount to his presenting the message contained in them.

And 1 cannot succeed with a false advertising claim against Gittens based on FX's promotional

flyers for the Streetball Legends games.  The message contained in Gittens's autograph card was not

actually false.  In using a picture of himself in his And 1 uniform, Gittens was conforming to the

terms of his contract, by sending the true message that he was an And 1 player.  And 1 presented no

---

[6]The concept of contributory infringement is most commonly applied in a manufacturing setting, where the manufacturer facilitates a distributor in counterfeiting or otherwise passing off its goods as the goods of another.  Some courts have allowed the expansion of contributory infringement to areas outside of direct manufacturing, in cases where the defendants promoted and facilitated the infringement of a mark, but were not directly involved in the sale of a product or service.  *AT&T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1432 (3d Cir. 1994); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264-65 (9th Cir. 1996).

evidence Gittens intended to, or actually did deceive anyone with his autograph card. Gittens's using a photograph of himself in his And 1 uniform shows only an intent to conform to his contract by appearing in photographs in And 1 products. And 1 has failed to establish a claim for false advertising against Gittens.

And 1 claims both common law and statutory unfair competition under Pennsylvania law. The elements for a common law cause of action for unfair competition are the same as the elements of trademark infringement under the Lanham Act when the allegedly misleading conduct is undertaken by a competitor. *Serbin v. Ziebart Int'l. Corp.*, 11 F.3d 1163, 1175, 1179 (3d Cir. 1993); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 580 (E.D. Pa. 2002). And 1 has failed to establish the elements of trademark infringement under the Lanham Act against Gittens; thus, And 1 has also failed to establish the elements of an unfair competition claim under Pennsylvania common law. Only purchasers of goods or services may bring a cause of action under the state's statutory unfair competition law. 73 P.S. § 201-1 *et seq.* And 1 introduced no evidence to show it purchased Streetball Legends tickets or merchandise from Gittens. And 1 cannot establish a cause of action under Pennsylvania's statutory unfair competition law.

And 1's state law claim the defendants intentionally interfered with existing and prospective contractual relations with third parties fails because And 1 offered no evidence of any contract with any third party. *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978) (quoting Restatement Second of Torts § 766). Lack of evidence also precludes And 1's claim for tortious interference with prospective contractual relations. *Strictland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997).

To establish a cause of action for unjust enrichment, And 1 must prove (1) "benefits

conferred on defendant by plaintiff," (2) "appreciation of such benefits by defendant," and (3) "acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993), *aff'd* 637 A.2d 276 (Pa. 1994). The doctrine of unjust enrichment does not apply where the defendant may have simply benefitted as a result of actions by the plaintiff; the enrichment must be unjust. *Id.* And 1 has not shown that Gittens was unjustly enriched to And 1's detriment. Gittens earned the pay he received by performing in basketball games and making arrangements for other players to perform in basketball games. This enrichment was not conferred upon Gittens by And 1, but by the other defendants in this action. Because And 1 has failed to prove any of the elements necessary to recover for unjust enrichment, it is denied.

To establish breach of contract under Pennsylvania law, And 1 must show three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract, and (3) resultant damages." *Williams v. Nationwide Mut. Ins., Co.*, 750 A.2d 881, 884 (Pa. Super. Ct. 2000). The court will enforce the terms of a contract when its plain language clearly explains the parties' rights. *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 (3d Cir. 2002).

And 1 asserts Gittens had a duty under the Endorsement Agreements to inform And 1 of any third party usage of And 1's trademarks. The plain language of the Endorsement Agreements does not support And 1's argument. Under the agreements, Gittens was *only* obligated to notify And 1 if any third party *asked him* to use the And 1 name or logos, and the November 22, 2002 Endorsement Agreement relieves Gittens of responsibility for any third-party infringement. And 1 has not shown any evidence that anyone asked Gittens to use any of And 1's trademarks. The

14

Endorsement Agreements permitted Gittens to participate in basketball games and related events sponsored by companies other than And 1, and required Gittens to wear And 1's clothing in public. Any use of And 1's marks by Gittens was not at the request of FX, Woodruff, or anyone other than And 1 and, thus, in accord with Gittens's duties under the Endorsement Agreement with And 1.

The Lanham Act entitles a successful plaintiff to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . The court in exceptional cases may award reasonable attorney's fees to the prevailing party." 15 U.S.C. § 1117(a).[7]  Woodruff and FX have defaulted, leaving only the issue of the amount of damages, attorney's fees and costs. And 1 is seeking defendant's revenues and attorney's fees.  In the present matter, And 1 claims the revenues of FX and Woodruff from six games: Cleveland Tri C, $21,000; Toledo, $25,000; Detroit, $35,000; Cincinnati, $20,625; Cleveland State, $20,400; and, Indianapolis, $35,000.  And 1 does not

---

[7]15 U.S.C. § 1117(a) Profits; damages and costs; attorney fees

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

include the revenues from the Bahamas Events in its claim for damages.  The total revenue And 1 claims is $157,025.   Even though And 1 fulfilled its burden under section 1117(a) to prove revenues, the section allows the court "in its discretion [to] enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."  15 U.S.C. § 1117(a).  Woodruff believed he had And 1's permission to stage the Streetball Legends tour and Woodruff testified credibly his profits after expenses were minimal, ranging from nothing to an estimate of $4,000 for the Indianapolis game.  For those reasons, I will award no profits to And 1.

And 1 also claims $33,459.08 in legal fees and $1,923.78 in costs.  The Third Circuit has interpreted exceptional circumstances to include culpable conduct on the part of the losing party, such as bad faith, fraud, malice or knowing infringement.  *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 952 F.2d 44, 47 (3d Cir. 1991).  There is no evidence of bad faith, fraud, malice or even knowing infringement on the part of Woodruff and FX.  Woodruff stated he thought And 1 knew of their use of the And 1 name and he contacted Mark Edwards because he thought Edwards was an employee of And 1.  An award of attorney's fees to And 1 is not appropriate.

In exceptional circumstances, a defendant is also entitled to attorney fees when he is the prevailing party.  15 U.S.C. § 1117 (a); *SecuraComm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 282 (3d Cir. 2000) (holding the Lanham Act permits a district court to find a case exceptional based on a party's culpable conduct other than willful infringement).  Gittens states And 1's claims against him were brought in retaliation for the complaint Gittens filed against And 1 and the Basketball Marketing Company for breach of contract. And 1 and the Basketball Marketing Company knew at the time Gittens was playing for FX and did not sue any other player in the games. And 1 brought this case against Gittens thirty-six days after Gittens brought his breach of contract

claim against Basketball Marketing.  An award of attorney's fees to defendant Gittens is warranted as the prevailing party.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE BASKETBALL MARKETING | : | CIVIL ACTION |
| COMPANY, INC. d/b/a AND 1, | : | |
| BMC PLAYERS, INC. | : | |
| | : | |
| v. | : | NO.  04-1733 |
| | : | |
| FX DIGITAL MEDIA, INC., | : | |
| COLUMBUS WOODRUFF, and | : | |
| TIM GITTENS a/k/a HEADACHE | : | |

**<u>ORDER</u>**

And now, this 10th day of March, 2006, judgment is entered in favor of Defendant Tim

Gittens and against the Basketball Marketing Company, Inc., d/b/a And 1and BMC Players, Inc.

Attorney fees and costs are awarded to Defendant Tim Gittens and against the Basketball Marketing

Company, Inc., d/b/a And 1and BMC Players, Inc. pursuant to 15 U.S.C. § 1117(a).  Judgment only,

without damages or attorney fees, is entered in favor of Plaintiff Basketball Marketing Company,

Inc., d/b/a And 1and BMC Players, Inc. and against Defaulting Defendants FX Digital Media Inc.

and Columbus Woodruff.   Defendant Tim Gittens's Motion to Strike (Document 34) is DENIED.

\s\ Juan R.Sánchez
Juan R. Sánchez, J.